H. D. Peck, for certain bondholders.

---

(Richland County Common Pleas, 1900.)

## IN THE MATTER OF THE ASSIGNMENT OF THE THOMPSON DRY GOODS COMPANY.

Assignees are creatures of law, representing both the assignor and all the creditors of the insolvent. They hold title to property upon well defined legal conditions and for certain specific purposes, and are powerless to do any act independent of the rights of all the creditors; and can make no disposition of real or personal property without the action and orders of the probate court.

Under sec. 6350 R. S., an order by the probate court authorizing the assignees to continue the business of the assignor can only issue when the probate court is satisfied that it would be to the best interest and advantage of the creditors, and upon the written application of three-fourths of the creditors, in number and amount, and such an order issued on the mere motion of the assignees, is without authority and everything done under it is void; and the assignees acting under it, render themselves liable and will be required to account for whatever was in their hands at the time, in such a manner as that the interests of the stockholders shall not be impaired.

Where assignees of an insolvent corporation, after having obtained an order for the sale of a stock of merchandise, appraised at $23,000, at private sale for not less than two-thirds of its appraised value, reported, without waiting for the expiration of the time fixed for making such sale, that they could not make a sale at the figure named, but could sell for $12,000, and it is made to appear that while the goods:

were nominally sold to other parties, they were paid for with money furnished by the assignees and were in fact sold and subsequently turned over to them, the sale is void.

Assignees making such sale, and acting under conditions referred to, without compliance with the statute, may be held for the appraised value of the stock, less *bona fide* payments, and to interest upon the difference between that amount and the amount for which the sale was made.

On exceptions to report of assignees Cockley and Hahn.

CAMPBELL, J.

This case was submitted to the court upon exceptions to the first partial account of the assignees, W. W. Cockley and W. M. Hahn; also, upon a petition to set aside the sale of the balance of the goods that remained unsold about August 4 or 5, 1898.

To go over this case in detail would require far more time than we have to devote to it today; but I will outline it so that the parties will have an understanding of my view of the case.

On November 23, 1897, judgments were taken against the Thompson Dry Goods Company as follows: W. M. Hahn, $512.68; Teft, Weller & Company, $1,588.14; W. W. Cockley, $824.00; Farmer's National Bank, $11,305.90; J. R. Brown & Son, $382.77; Bank of Mansfield, $14,455.88; Teft Weller & Company, $7,061.37;, Bank of Mansfield, $5,583.13; W. M. Hahn, $1,003.83; Bank of Mansfield, $777.71; making, in all, over $43,000.

Executions were issued on these judgments the same day and these were returned January 21, 1898. A deed of assignment was made by this firm and filed in probate court on the same day that these judgments were taken, November 23, 1897. An inventory of the stock was taken and that inventory was filed in prodate court on December 3, 1897, showing assets as follows: Merchandise, $51,174.86; cash on hand, $88.66; book account and credits, $2,165.41.

Arrangements were made between the sheriff and assignees, by which the assignees sold under order of the probate court, dated December 3, 1897. This continued up till January 22, 1898; then a motion was filed by the assignees for an order to purchase goods and an order was made the same day to purchase goods in such amounts as they deemed necessary. They also, at the same time, procured an order to continue selling at private sale. Under this arrangement, they continued to sell until March 23, 1898. At that time, they asked authority to purchase goods and sell as before till August 1, 1898.

At the time the first order to purchase goods was made, no inventory of stock then on hand was taken.

On July 26, 1898, the order of sale issued March 23, was returned, showing purchases up to that time amounting to $40,281. That was a mistake; it was considerably less. At that time, they reported sales amounting to $69,447.34 in all. That included what had been sold up to January 1, 1898. They then asked for a reappraisement of stock then remaining and it was granted. On July 28, the assignees filed an inventory showing stock on hand of the value of $23,134.66, and they, on the same day, procured an order to sell at private sale for cash, at not less than two-thirds the appraised value. The reappraisement was made by Martin Dobbs, James Currie and A. C. Lantz

On the same day, July 28, William Berno and Schantz filed affidavits that it would be for the best interests of the estate to sell at private sale, for not less than two-thirds of the appraisement, for cash. Upon that day, July 28, an order was granted, to be returned within fifteen days from that date. On August 4, the assignees made application for an order to sell the stock on hand for $12,000 and that was granted.

I may state here that James Currie and A. C. Lantz, although they had acted as appraisers, appointed on July 28, and made an appraisement of this property at something more than $23,000; on August 4—six or seven days thereafter—they made affidavits to the effect that the value of it was only $12,000. On August 5, these assignees made return of the order issued on July 28, to sell at private sale for not less than two-thirds of the appraised value, or perhaps it was on the fourth that they made that return, although they had fifteen days to accomplish this sale.

On August 5, they returned the second order that they had sold the balance of the stock as inventoried for $12,000 to H. M. Weaver and M. D. Ward. This report of the assignees was approved by the probate court, and there the matter ended, for the time being.

On November 10, 1898, the assignees filed their first partial account, showing the sales from December, 1897, to July, 1898, inclusive, to be $69,447.35; on the same day, the amount received from the sale of the balance of the stock, $12,000; collections since July 28, 1898, $967.57, making $82,414.91.

That they asked credit as follows: For goods purchased, $37,824.94; for amount paid Sheriff Boals, $17,761.91; for expense of selling, including labor, rents, attorneys' fees, taxes, probate court fees, etc., $14,705.79; total debits,

$82,414.91; total credits, $70,296.64; balance, $12,118.27.

They ask in their account filed November 10, certain items having been excepted to, they ask in their account $5,168.28, for their services, and $25.00 attorneys' fees on the account, simply for the making and filing of it, making $5,193.28, to be deducted from $12,118.27, leaving a balance of $6,924.99, to be applied to the payment of the indebtedness; which amounted to some $64,000, including the judgments that had been taken.

Now they arrive at their claim as follows: Percentage on $82,414, $1,768.28; services each for running store, $1,600, $3,200; extra work in litigation, $200.00; which makes a total, $5,168.28.

Now, exceptions were filed to this account on March 30—additional exceptions. It is unnecessary for the court to go into detail as to the exceptions that were filed. It is enough to state that those exceptions covered almost everything reported by these assignees. It covered the $37,000 paid for goods bought, for reasons stated in the exceptions; they excepted to the attorneys' fees, running expenses and assignees' fees. Upon hearing in probate court, all these exceptions were overruled except the attorneys' fees and assignees' fees. The attorneys' fees were $4,232.56, and were reduced to $1,000; and the assignees' fees were $5,168.28, reduced to $1,200.

Appeal was taken upon the judgment of the court upon everything, in having the account of the assignees revised, with the exception of the finding of the court upon the attorneys' fees and assignees' fees. Notice, I believe, was given by the defendant in the probate court, but no appeal was effected; at least, I find nothing among the papers. Therefore, upon the exceptions to this account, it comes here with the question of attorneys' fees and assignees' fees. left out. It was maintained, I believe, that all branches of the case came up on appeal, but when notice of appeal was given in the court below, it excepted that. But, whether all the branches of this case are here rightfully or not, nothing is claimed for attorneys' fees and assignees' fees. Both parties abandon the issue made upon that.

Now, on December 10, 1898, a petition was filed in the probate court by M. R. Lewis, against the assignees, to set aside the sale of August, 1898.

I may state here that exceptions were filed by quite a number of creditors, in probate court, but, as will be stated further along, it would appear that they are not interested now.

This petition to set aside the sale of August 5, 1898, was filed on December 10, and there were several cross-petitions filed by members of this corporation. It is unnecessary to state that this Thompson Dry Goods Company was a corporation and must be treated so in the disposition of this case and the relation of the stockholders to it. This entire case comes here in the interest of and upon the claims made by the stockholders alone.

That case was heard in probate court and the findings of that court was adverse to the claim of the plaintiff and cross-petitioners who had filed their pleadings therein.

This branch of the case also comes into this court by appeal and it is agreed that both of these cases should be disposed of together. Now, only two questions are presented for the consideration of this court. The first is: Were the said assignees lawfully authorized to purchase goods and sell the same in connection with the stock assigned by the Thompson Dry Goods Company? And the second: Was the sale made August 5, 1898, for $12,000, legal and should the same have been approved by the probate court?

Now, these questions are submitted for the determination of this court, to fix the responsibility of the assignees and define the rights of the creditors and stockholders interested.

From December 3, 1897, to January 22, 1898, as I have already stated, the assignees, by an arrangement made with the sheriff, sold under orders of the probate court and, at that time, they turned over to the sheriff $17,761.91. The cost of selling is not included in this amount. So that, whatever expense there was in selling for those two months is not comprehended in that.

Now, as to the first branch of this case. Assignees are creatures of law, representing both the assignor and all the creditors of the insolvent. They hold title to property upon well defined legal conditions and for certain specific purposes, and are powerless to do any act independant of the rights of all the creditors; and can make no disposition of real or personal property without the action and orders of the probate court. The probate court has only such power over assignees, in connection with the settlement of insolvent estates, as the law confers.

Section 6350, Revised Statutes, defines the duties of assignees: Then, in the same section, marked paragraph "C," it is provided that the court may order property disposed of at private sale. Now, what further may a probate court do in reference to the disposition of the business that was carried on by the insolvent? That is defined in the same section, paragraph "H." * * *

Here was a business conducted by a corporation having a large number of stockholders, and this assignment was made two months before this order was applied for or made.

The assignees, under order of the court, as stated in paragraph "C," had sold the goods during the month of December and the month of January, and it was not till the expiration of two months, when the sheriff was called upon to make his return, under the law, that this application was made to the probate court to carry on the business. By whom was it done? To authorize the court to order assignees to carry on business of any kind, what is necessary, under the statute? Now, is the written application that is mentioned in this paragraph "H" of the section referred to, is this written application of three-fourths of the creditors in number and amount, a condition precedent to the court ordering business to be carried on. If it is, the order issued in this case was without authority and, consequently void. Everything done under it was illegally done. Let us examine this for a moment, for the purpose of determining what was the status of these parties, whether they were conducting this business as prescribed by law. "The court may, when satisfied that it would be for the advantage of the creditors of the assignor," not upon motion of the assignees or trustees, but the law says: "upon a written application therefor, by a three-fourths in number and amount, of said creditors, an order may issue." Can it be claimed that that is not a condition precedent to the issuing of this order by the probate court, authorizing the assignees, in such an immense business as this was, to carry it on and leave it entirely discretionary with them to what extent they might purchase goods. As it turned out in this case, more than $37,000 worth of goods were purchased by these assignees and disposed of by them, in connection with the old stock on hand during the five months of the time they acted as such.

Rice v. Wellman, 5 O. C. C. 334, I think that throws light upon this question. This is a case decided in Defiance county by Judge Beer: "A failure to comply with the conditions precedent is not a mere irregularity or defect in the proceedings provided for, etc."

So that, taking the language of the statute itself, that this order can only issue when the probate court is satisfied that it would be to the best interest and advantage of the creditors, and upon the written application of three-fourths of the creditors, in number and amount, it does seem to me that this order issued upon January 26, 1898, was altogether without authority and everything done under it was void; and that these trustees acting under that, without any legal authority, rendered themselves liable and should be required to account for whatever was in their hands at the time, in such a manner as that the interests of the stockholders shall not be impaired. Now, the record in this case shows that nothing of that kind was done. These assignees simply went in there and filed a motion and that motion was sustained and this order was granted, without any attempt on their part to comply with the provisions of this statute. As I have said, the assignees can do no act without the authority of the law, and there was no authority for the court to issue such an order.

Now, we will pass to the second branch of this case. While I am not disposing of the question now as to how the assignees should account, under this condition of things, yet I think I can dispose of it on the other branch. At least, I will make an attempt.

Now, it is claimed, upon the second branch of this case, that the sale of August 5, 1898, was illegal and void for the reason that these assignees were simply selling to themselves. Now, how stands that question, upon the evidence? First, however, as to the law: Armstrong v. Huston's Heirs, 8 Ohio, 552, 554. This was a case where a sale was set aside because one of the appraisers purchased. Piatt v. Longworth's Devisees, 27 Ohio St., 159, 195. This is a case that was most elaborately tried, both in the trial court and Supreme Court. Now, on page 195, the court say: "He is engaged," one that attempts to purchase at his own sale, as it were, either directly or indirectly, "he is engaged in serving two masters when good faith demands that he should serve but one. * * * It is poisonous in its consequences."

Then again in Caldwell v. Caldwell, 45 Ohio St., 513, the syllabus of the case speaks for itself, and I will read a paragraph from page 521. The court say: "There is no middle ground— no compromise ground—between the assumption and full execution of his trust upon which such trustee can stand and say he has discharged the duties which his relation imposed upon him."

In Barrington v. Alexander, 6 Ohio St., 189, 197, the justice said: "However innocent the purchaser may be * * * it is poisonous in its consequences." "There may be fraud and the party not be able to prove it * * * and touches the very root of the evil."

Now, upon this branch of the case, there has been an unbroken line of decisions up to the present time, that a party acting in a trust capacity cannot be a purchaser at his own sale, either directly or indirectly; and it is most emphatically condemned by every judge that has ever spoken upon the subject.

Now what are the facts in this case? Did these two assignees, either directly or indirectly, purchase the remaining portion of this stock of goods? Did they sell it to somebody else and then purchase it back? Let us go to the testi-

mony of W. W. Cockley. They reported that they sold this stock of goods to H. M. Weaver and M. D. Ward. What does Cockley say on that subject? Here were these assignees, one of them president of the Farmer's National bank and the other president of the Bank of Mansfield. These banks were looking out for their own interests, as they had a perfect right to do; but, at the same time, the other creditors and the stockholders had interests here which should have been taken care of by these assignees as well.

Mr. Cockley says: "The stock of goods was sold under the direction of our attorney. There was no way to secure our judgment except that stock of goods and, after putting forth every possible effort to obtain a purchaser, the question was, what to do with the stock."

These assignees were ordered, upon July 28, to sell this stock at private sale, for not les than two-thirds of the appraised value; but, without waiting for the expiration of that time, they reported to the court that they could not sell it for that, but that they could sell it for $12,000. That, upon its face, does not look as though they had given sufficient length of time to the attempt, at least, to sell these goods, under this order of the court.

Q. "You and Mr. Hahn have bought up and got together all the general creditors, have you not? A. "No, sir."

Q. "Nearly all?" A. "No, sir, they were bought just as the goods were taken, to secure our banks."

Q. " * * * or are the claims bought?' A. "The claims are bought and assigned to the two banks."

So that, according to the testimony of Mr. Cockley, no creditors are interested in the event of this suit except the banks, and the stockholders of the Thompson Dry Goods Company, all the unsecured creditors of the corporation having been compromised and settled with.

Q. "That is not telling who paid the money, whether the banks paid any money to you and Hahn as assignees or not. How much money did they pay?" A. "$6,000 each."

Q. "Didn't you testify before that, that was put to the credit of the trust fund? Did you not testify that you individually put in $6,000?" A. "Really, I don't know."

Q. "Now, Mr. Cockley, if the banks paid you $6.000, the bank books would show that?". A. "Yes, sir."

Q. "Isn't it true that the first money that went to the credit of the trust fund went from you individually * * * ?" A. "I think possibly the bulk of it did."

Q. "Didn't every dollar of that $6,000 go from you individually to the trust fund? A. "I rather think it did."

Q. "You have the checks showing that you paid in that $6,000?" A. "Indeed, I don't know. If you will permit me, I will explain that," etc.

And then he says, in answer to the question: "In your report you say you have sold them to Ward and Weaver individually, which one is true, that you sold them to the banks or individually?" A. "My understanding of the matter was that they were acting as agents of the banks." Q. "Then your report to the probate court is not true?" A. "In that particular, my recollection is that it is not."

Now, it would seem from this testimony that there was a prearrangement between these banks and the agents of the banks, the stockholders, Ward and Weaver, that, while they would nominally take these goods at the sum of $12,000, they were immediately to turn them over to Cockley and Hahn as purchasers, in connection with another partner by the name of Berno.

With these facts testified to by Mr. Cockley and Mr. Hahn in this case, can there be any other couclusion than that the goods were to be turned back to Mr. Cockley and Mr. Hahn, and that they were the real purchasers at their own sale? I don't think there can be any question about that and such is the finding of the court.

Now, under these circumstances, what is the duty of the court with reference to the disposition of what these trustees or assignees should be charged with and required to account for?

The assignees report sales $69,447.34; amount received from sale of balance $12,000; collections since July 26, $967.57; total, $82,415.91.

Then they ask credit for goods purchased, $37,828.94; and amount paid to Sheriff Boals, expense of carrying on business and attorneys' fees, $32,467.70; total, $70,296.64.

The actual running expenses, according to my estimate, with the attorneys fees and the assignees' fees taken out were $10,473.23.

They report a balance of $12,118.27; from that they ask as fees, etc., $5,193.28; leaving a balance on hand $6,924.99.

As I have stated, the probate court reduced the assignees' fees and attorneys' fees to $2,200; in one instance the claim was something over $4,000 and in the other something over $5,000, which leaves a difference made by the probate court of $7,200.84.

The balance on hand as reported is $6,924.99; assignees' and attorneys' fees deducted $7,200.84; total, $14,125.83.

The appraised value of the stock on July 28, 1898, was $23,134.66; it was sold for $12,000; leaving a difference of $11,134.66.

I think the court, on the first branch of this case, might with propriety charge the assignees

with the appraised value of the stock of goods, less what they turned over to the sheriff and the running expenses for the sixty days up until January 23 or 24, 1898. But, while I think the court might do that, yet it was certainly with the knowledge of some of the stockholders of the Thompson Dry Goods Company that this thing was permitted to be carried along from January up until the month of August. 1898, although there was nothing in the evidence going to show that fact.

I have concluded that I would not make a calculation of the running expenses for that time, but would hold that the assignees should be protected in what they did up until August 4 or 5, 1898. It does seem to me that; at that time, they proceeded without authority of law and did things that cannot be sustained under any principle of law.

While they report the amount of $12,000 as the amount that these goods were sold for, at that time, yet it is the judgment of the court that they should be charged with the full amount of this $23,134.66. Not only that, but they should be charged with interest upon the difference between $23,134.60 and $12,000, which is $11,134.66; they should be charged with interest upon that for two years, from August 4, 1898, to August 4, 1900.

Interest for 2 years on $11,134.99... $1,336.00
                                      11,134.66
                                     _____
                                     $12,470.66
Balance in hands of assignees.. ... 14,125.83
                                     _____
                                     $26,596.49

And the finding of the court is that the assignees shall account for the total amount of $26,596.49.

---

(Montgomery County Common Pleas)
ISAAC H. KIERSTED et al. v. J. M. SMITH et al.
(Transferred by statute from Superior Court.)

In construing a will, words should be construed in their ordinary meaning and usual signification; the whole will should be construed as a whole; equitable words should be given their technical meaning; the law favors the vesting of estates. All these rules are subject to the application of the broader rule that the clear meaning of the *will*, showing the clear intent of the testator, must not be negatived or set aside.

The words "set off" and "partition" when the respective devisees arrive at age, used in a will, do not necessarily mean a division of the fee simple or inheritance estate between fee simple or inheritable estate between

for such devisees if it appears, taking the whole will together, that such was the intention of the testator.

It does not follow, from the use of the word "receive" in the will, that the devisees are given an entire estate under sec. 5970, R. S., which provides that every devise of lands, tenements or hereditaments in any will hereafter made shall be construed to convey all the estate of the divisor therein which he could lawfully devise, unless it shall clearly appear by the will that the devisor intended to convey a less estate. The last clause of this section clearly shows that the section does not necessarily mean that the whole estate must be devised to the first taker, unless the intention of the testator is clearly shown.

Unless some positive rule of law or enactments of statutes should require it, the court will construe a will so as to follow former constructions by courts and interested parties in the administration of an estate.

The rule in Shelley's case is not a rule of construction, but a rule of property.

A testator may use the word "heir," without its usual legal sense, or if the plain intention manifested in the will shows that it was not employed in its usual legal sense, but with words of explanation showing the manifest intent of the testator, it can be made a word of purchase.

If, where the word "heir" is used, there be superadded words of limitation, establishing a new succession, the first donee or devisee would take but a life estate.

The expressed intention of the testator will fix the meaning of the word "heir."

The rule in Shelley's case as applied to wills was abrogated by statute in Ohio, in 1840, sec. 5968 R. S. But even before the passage of this statute, it was held inapplicable to defeat the clearly expressed intention of the testator.

The rule cannot be appealed to to assist in ascertaining the intention of the testator.

The rule that such a construction will be favored as will contribute to the immediate vesting of an estate will not be applied so as to defeat the intention of the testator.

Heirs presumptive or apparent, although they have no vested interest in trust property, have rights that should be protected by the courts, and they can be heard as exceptors to the proposed termination of the trust if their rigts under the will are thereby affected.

A trustee under a will has no right to terminate the trust created by the will, with the consent of the *cestui que trust,* if the rights of third parties under the will are thereby impaired.

---

BROWN, J.

In the matter of the trusteeship under the will of George W. Smith, deceased, Isaac H. Kiersted, trustee.

The trustee filed a final report April 11, 1900,.